UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**CRESCENT JONES**,                                                    Case No. 6:15-cv-2062-KI

　　　　　　　　　　Plaintiff,                              OPINION AND ORDER

　　　v.

**CAROLYN COLVIN, Acting**
**Commissioner of Social Security**,

　　　　　　　　　　Defendant.

　　　Jeffrey H. Baird
　　　Dellert Baird Law Office, PLLC
　　　524 Tacoma Ave. S.
　　　Tacoma, WA 98402

　　　　　　Attorney for Plaintiff

　　　Billy J. Williams
　　　United States Attorney
　　　District of Oregon
　　　Janice E. Hebert
　　　Assistant United States Attorney
　　　1000 SW Third Ave., Ste. 600
　　　Portland, OR 97204-2902

Martha A. Boden
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-3710

      Attorneys for Defendant

KING, Judge:

Plaintiff Crescent Jones brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB"). I affirm the decision of the Commissioner.

## BACKGROUND

Jones filed an application for DIB in 2009, alleging disability as of December 15, 2007. The application was denied initially and upon reconsideration. After a timely request for a hearing, Jones, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on April 12, 2011. On September 21, 2011, the ALJ issued a decision finding Jones not disabled within the meaning of the Act and therefore not entitled to benefits. The parties then stipulated to a remand of the case to the Commissioner for further proceedings.

A different ALJ presided over a second hearing on February 2, 2015 and issued a decision on July 13, 2015 finding Jones not disabled within the meaning of the Act.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or

mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability.  The evaluation is carried out by the ALJ.  The claimant has the burden of proof on the first four steps.  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b) and 416.920(b).  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

Page 3 - OPINION AND ORDER

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Parra*, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations.  *Id.*

## THE ALJ'S DECISION

The ALJ concluded Jones' severe impairments were dysthymic disorder, major depressive disorder, and borderline personality disorder.  The ALJ also found that these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  According to the ALJ, Jones could perform a full range of work at all exertional levels, but with the following nonexertional limitations:  she could perform simple tasks repetitively, so long as they were consistent with unskilled work; she was limited to goal-oriented work, but not work requiring a production rate pace; she was limited to occasional interaction with supervisors but superficial (casual or perfunctory) interaction with coworkers; she could not interact with the public.

Given this residual functional capacity ("RFC"), the ALJ concluded Jones could not perform her past relevant work, but she could perform other work in the national economy, including office helper, stock helper of office supplies, and hand packager.  As a result, the ALJ found Jones not disabled within the meaning of the Act.

## FACTS

Jones, who was 35 years old on her date last insured, is not a high school graduate.[1]  Tr. 1166 (decision reflects Jones has a 10th grade education).  However, she has work history as an office manager, administrative assistant in a real estate office, and as a receptionist.

---

[1] In several report, Jones is described as a high school graduate with some post-high school education.  Tr. 194, 225, 244.  Jones testified to having a GED.  Tr. 1228.

Before her disability onset date, in January 2007, Jones complained of depression after she learned her husband had not been faithful. Her husband was in Texas at the time for army training. Jones was referred to the Spring Mountain Treatment Center, but she did not go saying she felt better the next day. Tr. 990. By April 2007, she was "doing well" and was "future oriented." Tr. 187.

Jones submitted no further medical records until October 2008, nearly a year after her alleged disability onset date, when she reported to Good Samaritan Hospital after overdosing on Tegretol and Ativan. At that time, she told Arshad Zaidi, M.D., that she had received treatment for her psychiatric issues since she was 12 years old, that her 13-year marriage was stable, that she had worked most of her life until she was laid off the previous year from her real estate assistant job, and that her husband was going to be deployed to Afghanistan. She reported feelings of low self esteem, emptiness, identity issues, and a constant feeling of not being loved. She explained that with her husband leaving for Afghanistan, and her job loss, "the feeling of being unemployed and living in a financially restrained environment is a stress on her." Tr. 225. She thought her unemployment had caused her increased feeling of lack of self worth. Zyprexa had worked for her in the past, but she quit taking it when she gained weight; she had not seen a psychiatrist or received any treatment for a year and a half. Dr. Zaidi diagnosed dysthymic disorder, rule out major depressive disorder, rule out bipolar disorder, and borderline personality disorder.

Jones established treatment with Good Samaritan Behavioral Health Services in November 2008. In therapy, she explored issues related to her depression, suicide ideation, her focus on her husband's past infidelity, and nightmares. Jones also explained that she lost custody

of her children for a period of time in the past and the court had ordered her to receive treatment. Her daughter had been returned to her, but her son continued to live with a relative during this time. Fran Corn, LCSW, described Jones as "having moved through life changing events and traumas with considerable resiliency until recent OD. Now is with renewed commitment to stabilization." Tr. 265. By January 2009, while her husband attended training for a month, Jones was driving three hours a day to drop her daughter at school, and she was visiting with friends and working on expanding her social system. Corn expressed concern about Jones' use of marijuana. Jones continued to improve, reporting having no further thoughts about her husband's affair, and learning that she needed "repetition and predictability" to remain stable. Tr. 261.

In February 2009, Jones explained that her husband would be deployed and the military would provide her with in-home services 10-40 hours a week, but that she had declined that offer as she had other resources available. Corn thought Jones was "moving toward resolution of her fears and dependency regarding husband deployments." Tr. 259. She noted Jones appeared to be using her support system, was active, and engaged in healthy distractions. In April 2009, Jones was "doing well, keeping busy socially, playing cards weekly with friends, overseeing [daughter's] activities[.]" Tr. 257.

A month later, at the end of May 2009, Jones pulled a knife on her husband while under the influence of alcohol and sleeping medications. Afterward, Jones presented as "quite self-assured that she has a handle on the problems." Tr. 256. She "appeared unable to process or speak abstractly, stayed very concrete, black white thinking[.]" *Id.*

Page 7 - OPINION AND ORDER

In June 2009, Jones spoke "non stop" about her anger at her husband.  Tr. 255.  She also felt anxious and looked forward to receiving disability payments to empower her to make a decision about whether to leave her marriage.  She planned breast augmentation to boost her ego.  Corn thought Jones appeared "manic with rage and much use of bad language for self expressing."  Tr. 255.  A few weeks later, Jones was still showing signs of "observable symptoms of hypomania with rapid speech and run on ideas about her plans to cope" with her husband's deployment.  Tr. 251.  By July 2009, Jones said medications had reduced her mania by fifty percent and Corn found her to have a calmer mood.  Jones' son was visiting and she wanted to work to keep him.  She wanted to stay busy to distract herself.

Jones admitted to skipping medication doses in August 2009; she appeared stable overall.  She reported being off of all her medications in September 2009 due to nausea and vomiting.  Dr. Zaidi started her on benzodiazepines and then Cymbalta.  Jones denied feeling severely depressed, but she was not happy either.  She felt no depression in October 2009.  Chris Coleman, MSW, considered Jones to be doing quite well with her medication and self-management.  Dr. Zaidi also found her to be stable.  In both November and December 2009, she reported no depression or anhedonia in the past two weeks.  She was taking Lorazepam and Cymbalta, although she was not taking all her medications as prescribed and was smoking marijuana instead.

Jones began having trouble with her son in December 2009, but Corn thought Jones had a "constructive behavioral plan" and praised Jones for trying alternative options.  Tr. 341.  In March 2010, Jones established care at the Mental Health Clinic at McChord Air Force Base.  She reported to Ronica Sobiech, LCSW, that her son had been expelled from school and had been

arrested; she was crying a lot and had passing suicidal ideation all month.  At the end of March, Jones reported having breakdowns every other week as a result of feeling frustrated or overwhelmed.  The first two weeks of April 2010, Jones reported feeling angry, that she was crying frequently, and had daily nausea and vomiting.  But by the end of April, Jones said she felt able to cope with her son, and she reported that the medication was beneficial as the Zyprexa had stopped her nausea.  Her son continued to pose a challenge and she was working with agencies and the school to obtain assistance.  She began preparing for her husband's return in May, the Olanzapine was working, she had no suicidal ideation, and she was feeling irritable only situationally.

Jones and her husband had a good meeting initially.  She had no suicide ideation.  In June 2010, she noted that she felt "worthless because she is not working and does not have her own money."  Tr. 506.  She was not taking her medications consistently and she was drinking alcohol. Several days later, she reported no suicidal ideation, but she was angry.  The Olanzapine had improved her sleep, nausea, and appetite.  Her provider, Simon Pincus, M.D., encouraged alcohol abstinence and warned her about the impact on her mood of marijuana and the drug "spice."  Tr. 501.  In July 2010, Jones thought about suicide for 30 seconds up to five times a day, without plan or intent.  She felt a marked increase in irritability and depression attributable to her husband and son and she was verbally hostile in the session.  She was using marijuana three days a week.  Jones declined the referral to DBT therapy because it would be inconvenient to drive to Olympia for appointments.  She was calmer in early August 2010, but just a few days later her husband called 911 and she was seen at St. Clare's emergency department for mixing alcohol and Seroquel upon discovering her husband's infidelity.  She was released when her blood alcohol

level dropped.  She then took Ativan and sought voluntary admission to the St. Joseph Medical

Center.  She almost immediately asked to leave when she was told she could not smoke there;

she insisted she had no suicidal ideation and was released.  At this point, her diagnoses were

episodic mood disorder, cluster B traits versus personality disorder, and substance abuse

("spice").  She was taking Lamictal for mood stabilization, Olanzapine for mood stabilization

and nausea, and Atarax as needed for anxiety.  Throughout August, Jones expressed suicidal

ideation, difficulties with substance abuse, ambivalence about her relationship, and anxiety.  By

September 2010, Jones reported her relationship was over and she had no suicidal ideation.

Olanzapine was effective at decreasing her mood swings and irritability.  In October 2010, she

and her husband attended a marriage retreat.

     In November 2010, Jones underwent an evaluation with testing by Chaska Barksdale, a

clinical psychology resident.  Dr. Barksdale noted the validity scales demonstrated appropriate

and consistent responses, but that Jones "attempted to portray herself in an exceptionally negative

manner, free from any positive qualities."  Tr. 444.  Dr. Barksdale suggested two possible

readings of these scores, but noted that, as a result, "interpretation of the remainder of the

assessment should be viewed with caution as they may not serve as an adequate descriptor of the

patient's level of functioning."  *Id.*  Jones' scores reflected "prominent impulsivity and emotional

lability," high anxiety and tension, and in a state of constant flux and crisis.  Tr. 444-45.

Nevertheless, Jones was motivated for treatment, and could benefit from anger management and

regular evaluation of her suicidal ideation.

     In December, Jones learned of her husband's report date to Texas; she had been sobbing

uncontrollably for three days.  She was taking her medications but did not feel stable.  A few

days later, she had no suicidal ideation, and she felt the medications were somewhat beneficial. She confirmed abstinence from alcohol, marijuana and "spice." She appeared to have a more even mood than her reports of crying. Jones told Sobiech that she and her husband had started marriage counseling, and that Jones was unsure about moving to Texas. She reported an improved mood. Tr. 408. In January 2011, Jones told Sobiech that she was preparing for the upcoming move and that she intended to keep a daily routine to stay busy. When she was not busy, her mind became overactive. She was proactive and appeared to display even moods. In February 2011, Dr. Pincus reported that after 39 sessions of therapy and pharmacological services, Jones' mood stabilized and she appeared highly motivated for treatment; her prognosis was fair. Her care was terminated upon her move to Fort Sam in Houston.

She established care in April 2011 with Thomas Small, M.D., at 359th Medical Group. She was taking Lamictal and Klonopin and was doing well. Tr. 1072. Dr. Small referred her to Behavioral Health and psychiatry. She was seen by a psychologist in May 2011, who noted psychomotor restlessness and a labile mood that fluctuated rapidly. The session focused on her husband's infidelity and on Jones' need to find coping strategies for her own life. She was having trouble finding a psychiatrist. Jones obtained counseling from Hilary Monford, LCSW, in June 2011, reporting that the move to Texas had triggered anxiety and depression since her husband had engaged in an affair there several years earlier. Jones appeared logical and linear, clear and coherent, with appropriate eye contact and without suicidal ideation. Two weeks later, Jones gave many reasons why interventions Monford suggested would not work. The two of them worked on identifying Jones' goals.

July sessions were focused on Jones' belief that her husband was having an affair, her depression about that, her desire for a divorce, and her need for a psychiatrist (and her failure to call to make an appointment). Monford pressed Jones on contradictions in her reports; for example, Jones "reported she has been playing racquetball with her husband and hitting golf balls, but in previous sessions stated she could not go for walks to help decrease her anger b/c it hurt her back." Tr. 732.

Jones finally decided not to get a divorce for financial reasons. She was interested in learning tools to deal with her self worth issues. A few days later, in August 2011, Jones reported hitting her husband over the head with a water bottle causing him to go the emergency room. She hit herself in the eye and reported to police that her husband had hit her. Jones subsequently terminated therapy on the military base as she was unhappy with the therapy she received.

In late August 2011, Jones was admitted to the Laurel Ridge Treatment Center with depression. She reported being separated from her husband. She was medically approved for outpatient treatment with prescriptions for Abilify, Klonopin, and Lamictal. Eric Mueller, M.D., assessed her with a Global Assessment of Functioning (GAF) score of 30, with the highest GAF in the last 12 months being 55. She was discharged on September 8, 2011.

## DISCUSSION

I.    <u>Medical Evidence</u>

Jones challenges the ALJ's treatment of Dr. Barksdale's November 2010 report. The ALJ found the report to be inconclusive as it listed nine different potential diagnoses, the validity scales indicated Jones attempted to portray herself in a negative manner, and the doctor identified

no functional limitations.  Instead, the ALJ relied on a November 2009 opinion by Michael Brown, Ph.D., a nonexamining psychological consultant for the agency.  The ALJ also relied on Jones' therapy history.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record.  *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066.  The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician.  *Widmark*, 454 F.3d at 1066 n.2.

Jones disputes that Dr. Barksdale's litany of diagnoses is a specific and legitimate basis to reject the doctor's opinion.  She cites no case law for this proposition, and the ALJ explained that the number of diagnoses suggested to him that Dr. Barksdale's opinion was inconclusive.  This is a rational conclusion to draw from the report.

The ALJ also commented on the validity scales, suggesting Jones exaggerated her responses.  Dr. Barksdale noted two explanations for the validity scales:  (1) they reflected Jones' limited insight into her behavioral health difficulties; or (2) they reflected Jones' exaggerated

negative evaluation of herself.  As Jones points out, there is evidence in the medical record to support both of Dr. Barksdale's explanations for the validity scores.  Counselors repeatedly commented on Jones' lack of insight and her refusal to change.  Tr. 257, 366, 500, 732.  They also repeatedly mentioned her low self-esteem.  Tr. 563, 225, 506.  Further, Dr. Barksdale was clear that Jones attended appropriately and responded consistently and that there was no evidence Jones was motivated to portray herself as being free from personal shortcomings.

Regardless of the reasons for the validity scales, however, Dr. Barksdale opined that the assessment should be viewed cautiously as it may not be indicative of Jones' actual level of functioning.  The doctor then went on to give areas of concern for Jones which were not traditional "functional limitations."  Jones argues that Dr. Barksdale's notations as to areas of concern should nevertheless have been considered by the ALJ in his assessment of Jones' RFC as they were observations supported by the record.  Specifically, Jones' "configuration suggests prominent impulsivity and emotional lability . . .with poor judgment in situations that produce intense emotions and frustration," anxiety, difficulty concentrating, confusion, and distractibility, and volatile relationships.  Tr. 445.  Jones argues these findings are consistent with marked impairments in ability to maintain persistence and pace, and in her social functioning, and that Jones would have difficulty sustaining basic work activities on a regular and continuing basis.

Frankly, Dr. Barksdale's suppositions are occasionally supported by the record.  *See* Tr. 265 (description of losing custody), 256 (pulled a knife on husband in May 2009), 501 (drinking alcohol and taking spice in June 2010), 355 (overdose in August 2010), 780 (uncontrollable sobbing for three days in December 2010), 730 (hit husband over head with water bottle in August 2011).  However, with no opinion about how these behaviors would translate in the

context of an employment situation, no indication as to the severity of the limitation, and with

Dr. Barksdale's warning about the need to view her findings cautiously, the ALJ was entitled to

rely on Dr. Brown's opinion who *did* translate the medical record into functional limitations.

Specifically, Dr. Brown opined that Jones would have moderate limitations in her: ability to

understand, remember and carry out detailed instructions; ability to maintain attention and

concentration for extended periods; ability to complete a normal workday or workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace; ability to

interact appropriately with the general public; and ability to get along with coworkers. Dr.

Brown then assessed Jones' RFC and concluded she could perform simple work if she need not

interact with the general public or coworkers. Dr. Brown's conclusions are also supported by the

record. *See* Tr. 225 (being unemployed in October 2008 caused stress), 262 (drove three hours a

day, showing resiliency, socializing), 257-59 (active, engaged in healthy distractions), 253

(mania calmed with medications), 1067 (no depression), 571 (coping with son), 415 (no suicidal

ideation for some time), 408 (improved mood), 360 (prognosis on termination of therapy is fair),

735 (cooperative, logical, linear, clear and coherent speech, attention and concentration normal).

In addition to Dr. Brown's opinion, the ALJ detailed the medical record at length and

concluded that Jones' symptoms worsened when she was laid off in 2007, when her husband was

deployed, when she did not take her medications as prescribed, and when situational stressors

occurred such as when her marriage became difficult and her son faced legal difficulties. The

ALJ, then, assessed an RFC that was consistent with Jones' activities of daily living, her past

work history, and her medical records. Without contrary opinion evidence supporting a

conclusion that Jones' serious, but sporadic, episodes would impose different functional

Page 15 - OPINION AND ORDER

limitations than those identified by Dr. Brown, I cannot find error. *Molina*, 674 F.3d at 1110

(court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn

from the record[,]" even if the evidence is susceptible to multiple rational interpretations); *see* Tr.

230 (October 2008 OD); Tr. 220 (May 2009 incident); Tr. 511 (stress related to son in March

2010); Tr. 353 (OD as a result of depression in August 2010); Tr. 730 (altercation with husband

in August 2011). The ALJ gave specific and legitimate reasons to give no weight to Dr.

Barksdale's assessment.

II.    Listings

Jones contends the ALJ erred in his assessment of her borderline personality disorder as

not meeting or equaling listing levels, when the ALJ did not rely on any medical sources in

arriving at that conclusion.

The listings set out at 20 CFR pt. 404, Subpart. P, App. 1 are "descriptions of various

physical and mental illnesses and abnormalities, most of which are categorized by the body

system they affect." *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990). For a claimant to show

that his impairment meets one of those listed, the impairment must meet all of the specified

medical criteria. *Id.* at 530. Alternatively, a claimant may show that his unlisted impairment is

"equivalent" to a listed impairment, but to do so she must present medical findings equal in

severity to all the criteria for the one most similar listed impairment. *Id.* at 531. Equivalence is

determined on the basis of a comparison between the "symptoms, signs and laboratory findings"

about the claimant's impairment, as evidenced by the medical records, "with the medical criteria

shown with the listed impairment." 20 C.F.R. § 404.1526. "Medical equivalence must be based

on medical findings." *Id.* "A generalized assertion of functional problems is not enough to

establish disability at step three." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If a claimant's impairment meets or is equivalent to a listed impairment, she is presumed unable to work and is awarded benefits without a determination whether she can actually perform prior work or other work. *Sullivan*, 493 U.S. at 532.

Jones bears the burden of proving that she has an impairment that meets or equals the criteria of an impairment listed in Appendix 1 of the Commissioner's regulations. *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005). Additionally, "[a]n ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." *Id.* As a result, I reject Jones' argument that the Commissioner was required to obtain a subsequent opinion from a medical source on the issue of equivalence. Jones did not argue equivalence at either hearing. Further, the tentative nature of Dr. Barksdale's assessment was not the sort of new medical evidence that should prompt the ALJ to obtain an updated medical opinion.

Further, contrary to Jones' assertion that the ALJ did not properly support his determination that she did not meet the listings, the ALJ relied on Dr. Brown's report, as well as on Dr. Pincus's records and on Jones' reported activities. The ALJ did not err.

III.    Credibility

Jones testified in April 2011 that she stopped working in December 2007, but the job ended when she was laid off and had to relocate to Washington. She did not seek treatment until she was hospitalized in October of 2008. She explained she went to the emergency room in 2010 because she broke down as a result of racing and obsessive thoughts. When she was working she

said, "[f]or a few years it seemed to get better, it really did.  I learned some skills.  I actually

learned that I could actually work whereas I didn't really ever consider that I'd, you know, be

able to.  And for awhile I was good at it.  Gave me pride, made me feel like I had purpose."  Tr.

35.  She testified that she now watched television and struggled with nausea, but then she cleaned

up the house and made dinner which gave her purpose.  At the follow-up hearing in February

2015, Jones testified that during the year her husband was deployed, she attended fewer than ten

of her daughter's activities, her son was in trouble a lot of the year requiring that she meet with

the principal and attend court proceedings, and that her daughter got herself to school.  She also

testified, somewhat inconsistently, that she drove her daughter to school and fished while waiting

for her, or hung out with a friend.

When the ALJ asked her if she could have performed very basic work during this

timeframe, she answered, "To be honest, I don't know that I considered the option of being able

to work . . . like behind the scenes or having a job where I wasn't working with the public, seeing

that all of my work history was you kind of go with what you've been doing."  Tr. 1208.  When

pushed, she said she thought that with even simple work, she would cry, would be frustrated, and

would be unhappy with the job she did.  She thought she would feel that way six of seven days.

When the ALJ returned to the topic again, Jones testified that she did not think about low stress

work at the time, and that it would not have benefitted her financially to do so.

The ALJ found Jones' testimony about her limitations not entirely credible.  Jones began

experiencing mental health symptoms at age 12, but she was able to work until she was laid off

in 2007 during the economic crisis.  The ALJ also mentioned inconsistencies in the record, such

as that Jones drove her daughter to and from school for a total of three hours every day, and that

Jones told her therapist she was increasing her social interactions and staying busy. Jones told Dr. Zaidi that her symptoms worsened when she lost her job and her husband had orders to deploy to Afghanistan. Jones declined DBT therapy as it would require her to drive to Olympia, when she had demonstrated the ability to drive long distances for her daughter, and she did not regularly take her medications.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. *Id.* The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. *Id.* "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Jones' ability to work despite her long history of psychological impairments is strong evidence that Jones could work again. She worked from 1998 to 2007, with one exception in

2006.  She stopped working because she was laid off (and because of her move to Washington), which is a clear and convincing reason to question her testimony about her inability to work. *Berry v. Astrue*, 622 F.3d 1228, 1235 (9th Cir. 2010) (reason for leaving work unrelated to disability); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (long-term limitations did not prevent claimant from completing high school, obtaining a college degree, finishing a training program, and participating in military training).  Additionally, her repeated statements to her therapists suggest that work would have been a stabilizing influence for her.  Tr. 1162 (ALJ noted her statement that her symptoms worsened with the loss of her job); Tr. 1208, 1216 (hearing testimony that she never considered simple work outside her field of experience).

Additionally, the ALJ noted inconsistencies in the record, including that Jones' level of activity was higher than she suggested.  She spent three hours in the car driving her daughter to school, fished during the day, took care of her children's needs, traveled to see friends, and she presented as alert, oriented, with normal psychomotor activity and organized thought processes in her therapy sessions.  She exercised regularly, had no trouble following instructions from the P90X exercise program, and demonstrated intact memory and cognition in her counseling sessions.  These are clear and convincing reason to question Jones' testimony about the extent of her limitations.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (daily activities and inconsistent statements about symptoms are clear and convincing reasons).

Finally, the ALJ questioned the extent of Jones' impairment when she declined to attend DBT sessions in Olympia, and when she was not consistent in taking her prescribed medications.  Although Jones questions the specificity of the ALJ's findings on this topic–and the ALJ certainly could have been more clear–the analysis is sufficiently specific to infer that Jones was

stable when she was taking her medications as prescribed.  Indeed, by February 2011, Dr. Pincus noted that Jones was able to engage in therapy once her mood stabilized with medications, and that she responded well to mood stabilizers.  Tr. 360-61.

Jones also suggests that the ALJ misrepresented the record when he wrote Jones was not compliant with her medications.  The record is clear, however, that Jones told Dr. Zaidi she did not take her medications unless her husband encouraged her.  Tr. 194.  There are other instances to which the ALJ referred when Jones was not taking her medications as prescribed.  Tr. 1164 ("not compliant with her use of various prescribed psychotropic medications" and "compliance with prescribed medications was reported better once she reduced her alcohol use").  These observations are supported by the record.  *See* Tr. 252 (Aug. 2009:  admitted to skipping dosages because of refill hassle); Tr. 316 (Sept. 2009:  not taking medications as directed); Tr. 1070 (Dec. 2009:  patient not taking all medications that are prescribed); Tr. 506 (Jun 2010:  "Pt relates medications somewhat beneficial; however, she does not take medications if she is drinking").

Failure to seek treatment, or comply with prescribed medications, can be a clear and convincing reason to question a claimant's testimony.  *See Molina*, 674 F.3d at 1112.  However, an ALJ must tread carefully when using this rationale in assessing testimony in the context of mental impairments.  Indeed, a claimant "may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."  *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (internal quotation omitted).  Or, "[i]n other words, we do not punish the mentally ill for occasionally going off their medication when the record affords compelling reason to view

such departures from prescribed treatment as part of claimants' underlying mental afflictions."

*Garrison v. Colvin*, 759 F.3d 995, 1018 n. 24 (9th Cir. 2014).

Here, Jones' decision not to engage in DBT therapy was not a result of her underlying mental impairments; records reflect she felt it was inconvenient.  Similarly, the record reflects her failure to take medication as prescribed had to do with the inconvenience of filling her prescriptions, or her desire to drink alcohol, rather than her underlying mental impairment.  Thus, the ALJ properly considered Jones' unwillingness to engage in DBT therapy, and her inconsistency in taking her medications, in questioning the reliability of Jones' testimony.

In sum, the ALJ did not err.

IV.    Lay Witness Testimony

Jones' husband, daughter and friend offered letters in support of Jones.  The ALJ noted that while all of the lay witnesses discussed Jones' lack of motivation, they neglected to address how her marijuana use affected her motivation.  The ALJ also pointed out that Jones' husband commented on Jones' inability to work for more than two to three months at a time, when Jones had consistently been employed for almost ten years.  The ALJ also found the friend's letter to be inconsistent with Jones' actual activities of driving her children to school

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness.  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006).

Jones' husband, Nathaniel Moss, reported that Jones and he were married in August 2006, that she could not retain a job for longer than three or four months at a time, that she

exhibited no patience for others in public, and that their relationship was marked by argument and trust issues.

Jones' friend, Monica Haman, indicated that Jones would drive her kids to school, then stay at her house all day and watch television.  Haman noted that Jones would get angry and had trouble concentrating, and that she did not like to socialize, but that she shopped for groceries, drove her children to school, and talked to her husband on the computer.  Haman cleaned her house and did her laundry.

Jones' daughter explained that her mother became easily frustrated and had difficulty dealing with others.[2]

Although Jones' medical providers expressed concern about the effect of marijuana on her mood, and on its interaction with narcotics, there is no support in the record for the ALJ's conclusion that it affected Jones' motivation.  Nevertheless, the ALJ gave a germane reason to question Moss's report about Jones' inability to hold a job, when she had been successfully working since 1998 until she was laid off.  Similarly, Harman's report about Jones' lack of sociability was inconsistent with Jones' activities with friends and, in any event, was accommodated in the RFC limiting Jones to only occasional but superficial interaction with supervisors and coworkers, and no interaction with the public.

---

[2] The actual report does not appear in the record.  The ALJ does not cite to the record, and the Commissioner cites only to the ALJ's decision.  In any event, Jones does not offer any specific argument about how the ALJ erred in his treatment of Angela Jones' statement.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards.  For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this ___28th___ day of October, 2016.


    __/s/ Garr M. King_____
    Garr M. King
    United States District Judge